UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

=======================================================

JOSEPH H. PYKE, Individually and as personal
Representative of the estate of MATTHEW PYKE,
MAY P. COLE, CHARLES BENEDICT, PATRICIA
A. BENEDICT, JULIUS M. COOK, BEVERLY J.
PYKE, EDWARD SMOKE, SELENA M. SMOKE,
MARGARET PYKE THOMPSON, on behalf of
Themselves and all others similarly situated,

                         Plaintiffs,

v.                                        5:92 - CV - 0554
                                        (NPM / DRH)

MARIO CUOMO, THOMAS CONSTANTINE,
ROBERT B. LEU, and ROBERT R. BROOKS,

                        Defendants.

=======================================================

APPEARANCES                                    OF COUNSEL


BOIES, SCHILLER & FLEXNER, LLP         DAVID A. BARRETT, ESQ.
Attorney for Plaintiffs
570 Lexington Avenue
New York, New York  10022

BOIES, SCHILLER & FLEXNER, LLP         JEFFREY S. SHELLY, ESQ.
Attorney for Plaintiffs
10 North Pearl Street
Albany, New York  12207

1

| | |
|---|---|
| ATTORNEY GENERAL<br>THE STATE OF NEW YORK<br>Attorney for Defendants<br>The Capitol<br>Albany, New York  12224-0341 | ELIOT SPITZER, ESQ. |
| ASSISTANT ATTORNEY GENERAL<br>THE STATE OF NEW YORK<br>Attorney for Defendants<br>The Capitol<br>Albany, New York  12224-0341 | CHRISTOPHER W. HALL, ESQ. |
| OFFICE OF COURT ADMINISTRATION<br>THE STATE OF NEW YORK<br>Attorney for Defendants<br>98 Niver Street<br>Cohoes, New York  12047 | JUDITH I. RATNER, ESQ. |
| NEW YORK STATE DEPARTMENT OF LAW<br>Attorney for Defendants<br>Civil Recoveries Bureau<br>The Capitol<br>Albany, New York  12224 | KEITH A. KAMMERER, ESQ. |
| WILLKIE, FARR & GALLAGHER, LLP<br>Attorney for Defendant Mario Cuomo<br>The Equitable Building<br>787 Seventh Avenue<br>New York, New York  10019 | LAWRENCE OWEN KAMIN |

NEAL P. McCURN, Senior U.S. District Court Judge

<u>MEMORANDUM-DECISION AND ORDER</u>

In this civil rights action brought pursuant to 42 U.S.C. § 1983, plaintiffs allege that defendants violated their constitutional rights by refusing to provide police protection to the Mohawk Indian Reservation ("Reservation"), also known as Akwesasne,  during a

2

period of unrest that started in the late 1980s and culminated with the deaths of two persons on May 1, 1990. Plaintiffs claim a violation of their equal protection rights secured by both the United States and New York State Constitutions, alleging discrimination against them on the basis of their Native American race and national origin.

Pending before the court is defendants' motion for summary judgment on the plaintiffs' equal protection claims (Doc. No. 138), and defendants' motion to strike certain exhibits submitted by plaintiffs (Doc. No. 181 ). For the reasons set forth below, defendants' motion for summary judgment will be granted, and the motion to strike will be denied as moot.

**I.     Background**

Familiarity with the facts and procedural history of this case is assumed.[1] The court will recite further undisputed facts only as necessary to clarify its findings. The named individual plaintiffs are representative of the class of 5,000 Native American residents of Akwesasne. Defendants are Mario Cuomo, Governor of the State of New York at the time of the alleged incidents; Thomas A. Constantine, Superintendent of the New York State Police during the relevant time period; Robert E. Leu, commanding officer of State Police Troop B in 1990, the troop which had jurisdiction over and

---

[1] See e.g., Pyke v. Cuomo, 1995 WL 694624 (N.D.N.Y. 1995); Pyke v. Cuomo, 2000 WL 1456283 (N.D.N.Y. 2000), and Pyke v. Cuomo, 258 F.3d 107 (2d Cir. 2001).

responsibility for New York State Police activities in the portion of the Akwesasne Reservation which lies within the State of New York; and Ronald R. Brooks, commanding officer of Troop B through 1989. Defendants are being sued in their personal capacities only.

The case was reopened on August 16, 2001, pursuant to a mandate of the Second Circuit Court of Appeals. An order granting the plaintiffs' motion to certify the class was entered on August 8, 2002 (Doc. No. 123). Discovery resumed on the motion for summary judgment under the guidance of Magistrate Judge David R. Homer.

The parties have undertaken extensive discovery and have produced a voluminous record.[2] As this court painstakingly reviewed the documentation, it was astounded by the labyrinth of governments, police agencies, competing factions and factors that came into play on the Akwesasne Reservation. The defendants were charged with the task of charting a course through this maze, including balancing the threshold issues of jurisdiction and sovereignty, in order to provide police protection to the people of Akwesasne.

Akwesasne is divided by the international border between the United States and Canada, and accordingly, is subject to the jurisdiction of both nations, as well as two provincial governments, Ontario and Quebec, the New York State government, and three local Native American governments on the Reservation. The St. Regis Mohawk Tribal

---

[2] In total, the documents, pleadings, legal memoranda and exhibits produced for the court's examination and review formed a pile over three feet in height.

Council ("Tribal Council") is the governing body recognized by the United States and the New York State governments. Three elected Chiefs head the Tribal Council. The national and provincial governments of Canada recognize the elected Mohawk Council at Akwesasne ("Mohawk Council") as the governing body on the Canadian side of the Reservation. A third governing body not formally recognized by the United States or Canada is the Mohawk Nation Council of Chiefs ("Mohawk Nation Council"), a traditional Mohawk government that views Akwesasne as one territory encompassing both sides of the border. The Chiefs of the Mohawk Nation Council are chosen by consensus among members of the Mohawk community through ancestral Clans.

In addition to the governing bodies, there are also several police agencies with jurisdiction on the reservation. On the Canadian side of the international border, the Royal Canadian Mounted Police ("RCMP"), the Ontario Provincial Police ("OPP") and the Surete du Quebec provide national and provincial police protection. In addition, there is an indigenous police force on the Canadian side of Akwesasne, the Mohawk Tribal Police Force. On the United States side of the border, the Bureau of Indian Affairs ("BIA") has federal jurisdiction over Indian tribes. The BIA is assisted by the U.S. Attorney's Office, and utilizes the Federal Bureau of Investigation ("FBI") as its law enforcement arm. In addition, the New York State Police ("NYSP") has jurisdiction on the Reservation pursuant to 25 U.S.C. § 232.[3] Specifically, Troop B of the NYSP has

---

[3] 25 U.S.C. § 232 states in pertinent part that "[t]he State of New York shall have jurisdiction over offenses committed by or against Indians on Indian reservations within the

jurisdiction over and responsibility for the portion of the Akwesasne Reservation which lies within the State of New York.

Native American sovereignty and its interpretation pursuant to the vast body of case law compiled over many decades, and the NYSP's attempt to comply with that law added to the difficulty in providing police protection on the Reservation. The record is rife with incidents where the NYSP were welcomed on the reservation for one incident, only to be unwelcome and confronted for another.

Further muddying the jurisdictional waters was the 1988 Indian Gaming Regulatory Act ("IGRA"), codified at 25 U.S.C. §§ 2701 - 2721. "IGRA was passed by Congress in 1988, for the purpose of providing a federal statutory basis for the operation and regulation of Indian gaming. Since that time, numerous actions, which concerned jurisdictional issues arising under the statutory provisions of the IGRA, have been filed in both federal and state courts. In these actions, the federal and state courts have had to apply the statutory provisions of the IGRA in order to determine if the court did or did not have jurisdiction over the action." See Jurisdiction Issues Arising Under Indian Gaming Regulatory Act, 197 ALR Fed. 459 (2006). Considering that courts are still analyzing and refining the body of law surrounding IGRA to this day, almost twenty years after its passage, it is not unrealistic to presume confusion on IGRA's application soon after its passage when Indian gaming was in its infancy.

---

State of New York to the same extent as the courts of the State of New York have jurisdiction over offenses committed elsewhere within the State as defined by the laws of the State."

Another group emerged on the scene in the relevant time frame of this case: the Warrior Society ("Warriors"), also known as the Mohawk Sovereign Security Force. The Warriors armed themselves with a vast amount of weaponry, including AK-47s and other semi-automatic weapons.[4] The Warriors characterized NYSP presence on the Reservation as an invasion of their sovereign territory. In 1989, the Warriors began to actively interfere with State Police patrols.

The plaintiffs declare that the Warriors are a criminal organization. However, the descriptions and assessments of the Warriors in the record run the full gamut: young Mohawks who didn't know what they were getting into; traditional Mohawks whose main focus was maintaining the sovereignty of the Mohawk nation; pro-gambling enforcers hired by the operators of illegal casinos; terrorists who wouldn't allow the NYSP to enter the Reservation without the permission of the Warrior leaders; and/or a self-appointed law enforcement entity that protected the vast smuggling operation that was allegedly taking place on the international border, to name a few.[5]

The anti-gambling and pro-gambling posture of the Mohawk people did not honor the ideological boundaries of the various Mohawk governments, nor even the boundaries of Mohawk family units. The stance of the Tribal Council on gambling could, and did,

---

[4] The record shows that the majority of these guns were legal in New York State at all times relevant to the case at bar. Many non-warrior Mohawk residents of Akwesasne also possessed legal weapons.

[5] The court finds it conceivable that some members of the plaintiff class were in fact members of the Warrior Society at the relevant time period in this case.

change with yearly tribal elections. Pro-gambling family members faced anti-gambling members across roadblocks and dinner tables: parent against child, husband against wife, sibling against sibling. The record also indicates that some Warriors held anti-gambling beliefs, but the sovereignty issues they firmly believed in outweighed their views on gambling. Business owners wanted to run their businesses as usual, and were hurt by the roadblocks, regardless of whether the roads were obstructed by pro-gambling or anti-gambling factions, or by the NYSP.[6]

Added to this mix was the poor economic situation on the Reservation, a high unemployment rate among the Mohawk people, and the devastation of the Reservation's land and waterways by industrial pollution, causing the decimation of the Mohawk's agriculture and fishing industries. Fish, a staple of the Mohawks diet for centuries, was no longer fit for human consumption. Consequently, it is undisputed that some residents of the Reservation turned to the easy money of smuggling and illegal gambling.

## II.     Discussion

### A.     Summary Judgment Standard

A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is

---

[6] The defendants proffer, and the court concurs, that many, if not all of the traditional anti-gambling faction, including those taking part in blocking the roads on the Reservation, are also members of the plaintiff class.

entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  See also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82 (2d Cir. 2004).

"[I]n assessing the record to determine whether there is a genuine issue as to a material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought[.]" See Security Ins., 391 F.3d at 83, citing Anderson V. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505 (1986).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991), citing Anderson, 477 U.S. at 250-51.

While the initial burden of demonstrating the absence of a genuine issue of material fact falls upon the moving party, once that burden is met, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial," see Koch v. Town of Brattleboro, Vermont, 287 F.3d 162, 165 (2d Cir. 2002), citing Fed. R. Civ. P. 56(c), by a showing sufficient to establish the existence of every element essential to the party's case, and on which that party will bear the burden of proof at trial, see Peck v. Public Serv. Mut. Ins. Co., 326 F.3d 330, 337 (2d Cir. 2003), cert. denied, 540 U.S. 1005 (2003).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, supra, at 247-48.  At the

9

summary judgment stage of any litigation, "the trial court's task is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined ... to issue-finding; it does not extend to issue resolution." Gallo v. Prudential Residential Serv. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Id.

### B. 42 U.S.C. § 1983 Generally

In order to prevail on a claim under 42 U.S.C. § 1983, a plaintiff must establish the violation of a right secured by the Constitution and laws of the United States, and that the violation was committed by a person acting under color of state law. Section 1983 states in pertinent part that

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable....

42 U.S.C. § 1983 (West 2006).

### C. Violation of Equal Protection Under 14th Amendment

The plaintiffs allege that the defendants refused to provide, and withheld police protection from, the New York portion of Akwesasne on the basis of the plaintiffs' Native American race and national origin, and in doing so, denied plaintiffs the equal the protection of the laws, in violation of the Fourteenth Amendment to the United States Constitution.

The Fourteenth Amendment of the United States Constitution states in pertinent part that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S.C.A. Const. Amend. XIV § 1.  "Generally, for an equal protection claim to trigger strict scrutiny, the plaintiff must allege that a government actor intentionally discriminated against him or her on the basis of race or national origin ... Such intentional discrimination can be proven in several ways." Jana-Rock Constr., Inc. v. New York State Dept. of Econ. Dev., 438 F.3d 195, 204 (2d Cir. 2006) (citing Washington v. Davis, 426 U.S. 229, 242 (1976)) . "A law which is facially neutral violates equal protection if it is applied in a discriminatory fashion.  Government action also violates principles of equal protection if it was motivated by discriminatory animus and its application results in a discriminatory effect." Id. (citing Yick Wo v. Hopkins, 118 U.S. 356, 373-74 (1886)). "Plaintiffs challenging such facially neutral laws on equal protection grounds bear the burden of making out a prima facie case of discriminatory purpose." Id. (citing Davis, 426 U.S. at 241).

In delving through the supporting documents of this case, the court was struck by

the dearth of allegations of racial discrimination. Depositions, affidavits and testimony from people of all walks of life named gambling, smuggling, sovereignty, the economy, and the power struggle among the Indian governments as the issues causing the strife on the reservation. Some people objected to the presence of the NYSP on the Reservation, some wanted a greater NYSP presence. However, there was not a scintilla of evidence of racial discrimination against the four named defendants, and almost no allegation of racial bias outside the four corners of the plaintiffs' submitted briefs. In fact, the bulk of the plaintiffs' list of "The Discriminatory Effect of Defendants' Policies" and the "Defendants' Discriminatory Intent" consists of surmise, conjecture, and of statements taken out of context and given new meaning as discriminatory and/or racist remarks. The evidentiary documents produced during discovery, taken as a whole, reveal no such thing.[7]

The vast evidentiary record is exceedingly sparse on allegations of racial discrimination by the defendants against the Mohawk people. One of the documents the plaintiffs offer into evidence is a piece of paper containing derogatory racial comments as

---

[7] As an example, in Defendant Robert Leu's deposition transcript at page 186, while discussing response plans to various entities and municipalities within Troop B's jurisdiction, Leu refers to Akwesasne as a "different animal." In their memorandum of law, plaintiffs construe this remark as "an ancient racial stereotype ... describing Native Americans ...." (Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Doc. No. 162 at 6). In fact, federal courts, including the U.S. Supreme Court, have used this phrase on numerous occasions in the same manner. See, e.g., Tuan Anh Nguyen v. INS, 533 U.S. 53, 82 (2001) ("[F]acially neutral laws that have a disparate impact are a different animal for purposes of constitutional analysis than laws that specifically provide for disparate treatment"). See also U.S. v. Fruchter, 411 F.3d 377, 383 (2d Cir. 2005) ("Criminal forfeiture is, simply put, a different animal from determinate sentencing").

proof of a racial animus by the defendants toward the plaintiff class (Deposition of Thomas A. Constantine, Exhibit 5 ).  There is no authentication on that document of the author or authors, no traceable connection to any of the defendants, no indication of the date or of the context in which it was written.  In another allegation of racial discrimination, the plaintiffs point to the fact that non-Native Americans were turned away from the Reservation at the NYSP roadblocks, but Native Americans were "funneled right back into the reservation, past gun-toting Warriors, without either a detour or a warning." (Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, Doc. No. 162 at 15).  In fact, the anti-gambling factions turned non-Native Americans away from the Reservation at their own roadblocks, and allowed Native Americans into the Reservation.  The defendants assert, and the court concurs, that "[d]istinguishing between the people who live within the perimeter of the roadblocks or with other specific needs to enter ...,  and those who did not live within the perimeter and who had no particular need to enter ... is not a classification based on race at all, much less a facial or explicit racial classification." (Defendants' Motion for Summary Judgment, Doc. No. 180 at 8).

      The court deems the other examples of "evidence" of racial animus to be without merit.  While complaining that the NYSP notified the Warriors when they were responding to a call on the reservation, plaintiffs make little reference to the fact that the Tribal Council was also notified.  The record shows that such notification was part of the

13

overall pragmatic and common sense approach that the defendants instituted to allow them to do their jobs. The actions of the NYSP are explained and clarified by, inter alia, the authenticated business record produced by the defendants.   The court maintains that a reasonable jury would not find that the defendants withheld police protection from Akwesasne, and certainly not on the basis of the race or national origin of the Mohawk people.

The court finds that the plaintiffs' allegations of discriminatory effect and intent are without merit.  Plaintiffs fail to explain why, if the defendants were discriminating against them on the basis of race and national origin as alleged, these same defendants negotiated tirelessly, and inclusively, with all Mohawk factions and expended resources far beyond what was spent off the reservation to provide law enforcement.

In parsing the pleadings, depositions, answers to interrogatories, affidavits, and other materials to determine the existence of genuine issues of material facts, the court found many areas of disagreement on many issues.  There is no question that the level of strife, discord and violence among the Mohawk people on the Reservation was extraordinary.  Reasonable minds could disagree on the methods, degree and scope of police protection on the Reservation at the time relevant to this action, but the defendants proffer, and the court agrees, that "there are times when restraint is the most intelligent law enforcement."(Cuomo Deposition at 67:22-3)**.**  This court and the plaintiffs have the advantage of 20-20 hindsight in evaluating the defendants' actions.  The defendants had

to make instant decisions, decisions that would have both short term and long term ramifications.  The defendants had options available to them at the time that they chose not to utilize on the reservation: <u>inter alia</u>, sending in the Mobile Response Team ("MRT"), or sending in the New York National Guard to occupy the Reservation.  The defendants made a decision not to use either option.  Had they done so, plaintiffs posit, the lives of the two young Mohawk men might have been saved.  In the alternative, the defendants posit that the loss of life could have been enormous, and the underlying tensions that caused the violence would remain after the occupying force was withdrawn.  The defendants made difficult decisions reflective of difficult times in a community, under their jurisdiction, like no other in the state.  The court's role here is not "to evaluate whether the police action in question was the appropriate response under the circumstances, but to determine whether what was done violated the Equal Protection Clause." <u>Brown v. City of Oneonta, New York</u>, 221 F.3d 329, 339 (2d Cir. 2000).

Assuming, <u>arguendo</u>, that a jury could find discrimination on the base of race or national origin, the strict scrutiny standard would be triggered.  Under strict scrutiny, the government has the burden of proving that racial classifications "are narrowly tailored measures that further compelling government interests." <u>Jana-Rock Const., Inc.</u>, 438 F.3d at 205.  In the case at bar, the defendants proffer that they were trying to negotiate a peaceful resolution to the serious political divide on the reservation, and were attempting to accomplish same by talking to all the Mohawk people.  Federal mediators were

15

involved. Mohawk leaders from all factions were heard from. The Martin Luther King, Jr. Institute sent observers. In negotiating, the defendants were trying to avoid the possibility of outright warfare and the bloodshed that likely would have occurred had the New York National Guard or the MRT been sent onto the Reservation to quell the violence. Because the plaintiffs are members of a suspect class for the purposes of equal protection under the laws, the court hypothetically applies strict scrutiny to the case at bar and finds that a reasonable juror would believe that avoiding the potential for significant loss of human life is a compelling governmental interest. Further, the court finds additional affirmation that dismissing the plaintiffs' complaint of equal protection violation is the proper course of action.

### D. Qualified Immunity

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "In a suit against an officer for an alleged violation of a constitutional right, the requisites of a qualified immunity defense must be considered in proper sequence. Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive. Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" The privilege of

qualified immunity is "an immunity from suit rather than a mere defense to liability," and if the case is erroneously allowed to go to trial, the privilege is lost. Saucier v. Katz, 533 U.S. 194, 200-01 (2001). "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." Id. at 202. "A defendant official is entitled to qualified immunity if (1) the defendant's actions did not violate clearly established law, or (2) it was objectively reasonable for the defendant to believe that his actions did not violate such law." Ford v. Moore, 237 F.3d 156, 162 (2d Cir. 2001). "An officer's actions are objectively reasonable if officers of reasonable competence could disagree on the legality of the defendant's actions." Id. (internal quotations omitted).

As stated above, the court finds no genuine issue of material fact surrounding the issue of an equal protection violation. However, in the alternative, the defendants are entitled to qualified immunity. Extraordinary time, resources, and effort were expended on bringing the problems on the reservation to a peaceful conclusion. The defendants were tasked with dealing with many good people who were passionate in their beliefs and adamant about the outcome of the major disagreements on the Reservation over government, sovereignty, and gambling. The law as it applied to Native Americans was in flux. The 1948 law codified at 25 U.S.C. § 232[8] made it clear that New York State had jurisdiction "over offenses committed by or against Indians on Indian reservations within

---

[8] 25 U.S.C. §§ 232 and 233 have since been repealed to the extent that they conflict with IGRA. See Dalton v. Pataki, 780 N.Y.S. 2d 47, 66 (3rd Dep't 2004).

the State of New York," but it didn't come with a gambling caveat.  IGRA muddied the waters.  The record shows that defendants chose negotiation and mediation over brute force, and responded to calls on the reservation in a pragmatic and responsible way.  Accordingly, the defendants are entitled to summary judgment based on qualified immunity.

Again, the court is tasked here with discerning the issues, not deciding them.  The court is not resolving this matter or deciding for or against either party.  The court simply finds that no rational jury could find in favor of the plaintiffs because the evidence to support their case is so slight.  There is no genuine issue of material fact and a grant of summary judgment in the defendants' favor is proper.

The court acknowledges the defendants' motion to strike certain exhibits.  Because the record overwhelmingly indicates that there was no equal protection violation, the court will not address that motion.  Accordingly, the motion to strike certain exhibits is denied as moot.

In addition to the plaintiffs' equal protection claims, they advance various New York state law claims.  "[W]hen the federal-law claims have dropped out of the lawsuit at its early stages [i.e., before trial] and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice."  Carnegie-Mellon University v. Cohill, 484 U.S. 343, 350 (1988).  The dismissal of plaintiffs' equal protection claims leaves no federal claims pending in this litigation, and

the court declines to entertain plaintiffs' supplemental law claims.

## III. Conclusion

For the reasons set forth above, the defendants' motion for summary judgment (Doc. No. 138) is hereby GRANTED. The court declines to entertain plaintiffs' supplemental state law claims. The defendants' motion to strike certain exhibits (Doc. No. 181) is hereby DENIED as moot.

SO ORDERED.

December 21, 2006

_____
Neal P. McCurn
Senior U.S. District Judge